LLM Health and Social Services The next case of the morning is number 16-4059, Davis v. Dynamic Offshore, and we'll hear from Mr. Findley. Yes, Your Honor. Good morning. Good morning. Kyle Findley, representing the appellant Thomas Davis. May it please the Court? What we have here is an issue, kind of two issues, that I want to hone in on. Number one, being that a principal is not protected by an independent contractor defense, if he implicitly or You know the offshore regs on it, don't you? If he explicitly or implicitly authorizes the work. And number two, we're going to talk about ultra-hazardous condition. But starting with the first point, I think it's important to note that the facts of this case dictate, at the summary judgment stage, they all should be construed in favor, like most favorable to the plaintiff. Well-established case law. And I think if you look at the order that was rendered, they were construed against the plaintiff. What we have here is a person in a personnel basket transfer, Dynamic, who is a principal, who authorized work on a day when there are 30 to 35 mile an hour winds, recorded at a buoy, and dangerous conditions going on. But the person who authorized the transfer wasn't on that platform, correct? Correct. The Dynamic, who is the principal, was not actually on the platform. They are on a platform. There is a group of platforms in the Gulf of Mexico, 79, 89A, I think you saw some of the terms. But he is at a different platform, but he is overseeing all 22 platforms. How does he know the wind condition? Because the wind condition, there is a buoy right there. How do we know he knew it? How do we know he knew it? Because all these platforms come from that same area, and they all look to that buoy, which is a weather buoy, for wind. That's the only one. Excuse me. You go ahead. Did your client have authority, his stop work authority, not to take the personnel basket when the wind was supposedly too high? Yes, Your Honor. I think all offshore companies preach stop work authority. And they tell everyone they have stop work authority, and I think that's important in this case because stop work authority was not exercised from the standpoint of they told Thomas Davis, you're going to have to do this when he says – or excuse me, you're going to have to repair this winch. He says, I'm not going to do that. I want to talk to the boss. I want to talk to Dynamic. Why didn't he call him up instead of taking the personnel basket to a different platform? Why didn't he just radio? Well, I think the issue with that is exercising stop work authority offshore is a sensitive topic in itself, and he wanted to have a discussion. And the way he described it in his deposition, which is in the record, is he thought it was a more professional way to go up to the top and talk to the Dynamic personnel. But now he says it wasn't safe, much less professional, to get in the personnel basket. To get in the personnel basket. Well, I mean that is right, but I guess what we have here is what plaintiff says is not dispositive of itself. And I think if you look at the case law regarding implicit control over work, it dictates that even if he's done basket transfers a thousand times, even if he has stop work authority, I think Judge Jones talked about some of these facts in the Callahan case which show that what plaintiff says of itself is not dispositive, and facts need to be leaned in favor of the plaintiff at the time. But I don't understand what the factual issues are in the case. What you've explained to us is not – it's whether there's a duty, and that's what the issue is. So, correct, and let me explain that for a second. What we have is platforms where Troy Rocca unexplicitly says he is a supreme authority. He's a Dynamic personnel. Supreme authority who determines the work to be performed. He assigns the work. On the day in question, he had no discussion with anyone about to assign the work. He assigned the work of working on cranes. He admits in his deposition that he didn't check the weather the way he should, and he admits some of the things. And he has a duty to when he is assigning work to not do it when there are dangerous conditions. And I think that the fact issue exists that he assigned work to work on a crane on the day in question despite the fact that there are being heavy winds of 35 miles an hour. And whether or not that was a reasonable decision on his part to authorize this work and to do this work is a fact question for the jury. And for, and I think what it's important to say is if you look at Magistrate Freshner's order, what he, his order turns on is the fact that he says there was a fundamental flaw because Dynamic did not order the work. He simply asked if Thomas Davis had time to do it. And that is stepping in the shoes of what a jury should determine. And it goes against what the law says regarding when you consider a motion for summary judgment, every inference regarding the underlying facts need to be construed in favor of the plaintiff. So you're saying just because he, if we assume that he ordered the work, then you should get a chance to go to the jury. What I'm saying is he has a duty to not conduct work. He's the one who looks at the weather. He's the one who makes the determination. He has a duty to not authorize work or force work in dangerous conditions. Are you backing off this ultra-hazardous argument that you started with in the briefs? I'll get to that argument in a second, but I can address it right now if you'd like. I don't think we're backing off of it. Our only point with ultra-hazardous is the case law that's been cited regarding ultra-hazardous, as the court is well aware, there's a three-point factor test. We meet that. It's really what the case law says regarding basket transfers. Is a basket transfer ultra-hazardous? And Louisiana law says it's not. Correct. And I'm not here to say that basket transfers in and of itself is a ultra-hazardous condition. I'll agree with that, and the case law is clear on that. However, the basket transfers decided by the courts that say it is not an ultra-hazardous condition do not have the conditions that were present on the day in question. At some point, a basket transfer must become an ultra-hazardous condition. Well, but that's not the way the law works, is it? It doesn't look at the particular facts and circumstances around to define ultra-hazardous. Instead, those things become issues related to the people involved in the activity, which may create some negligence or other issues, but that's not. An ultra-hazardous condition is a small universe of defined things that are by their very nature ultra-hazardous, and they don't depend upon the when and the how and the who and the facts. Correct. And I think that's right, but what we're saying is this. It's from the standpoint of ultra-hazardous condition. I think the court defines it as something that no matter how much care you do, a risk is still there. That's what ultra-hazardous is. It's dealing with explosives, pile driving. I think those are the terms they use. What we're saying in this situation was you have almost hurricane-type winds. At that point, it doesn't matter how much care you use in a crane when doing a personnel basket transfer. When you have winds that helicopters will not even land in, there's still a risk that is present. But your client had the authority not to take the personnel basket. In fact, he wanted to take it to go personally discuss this professional change, supposedly. I don't see how you get beyond your own client's liability. Well, I think whether or not he's—I think that would go to comparative fault, and I think it would still go to a fact question. It's not a matter of law that because he got in the basket transfer, therefore, he can never, ever— As we've seen, welding can be an ultra-hazardous activity, too. So you're really asking for a significant change in Louisiana law, aren't you, by saying it's a fact-specific determination? As far as ultra-hazardous, it would be a change from what we've seen previously, but not a drastic change. Well, tell me the Louisiana case law that supports your—I mean, we are working with Louisiana law, right? Correct, we are. Well, the case law that is out there for basket transfers right now, the ones that were cited by the defendants, have nothing to do with weather and not dealing with ultra-hazardous. Now, they did cite a case that recently just came out. I believe it was the Menard case, and I think that—well, first of all, that case talks about weather in a footnote, ultra-hazardous condition in a footnote. What the case stands for, what I took out of it, was the fact that they cite specifically that there is no evidence of implicit or express authorization. It does talk about there being rough seas, but I think our biggest point regarding this case, how it helps us, is the fact that there was no one present at that rig, but the court clearly states there was no evidence at all of LLOG authorizing, directing, or dictating the work. That is different from our case, because our case, there is authorization, dictation, as well as him unequivocally saying that he told them to do it. And that's where we get here, is we have a principal who is directing work to contractors. The contractor, in order for him to do this work, would have to get in a personnel basket. And it goes back to your question earlier about your client got in the basket. Well, in order to do the work, whether he's stopping the work or whether he is doing the work, in order to do it, he has to get to the platform. That's not correct. Why couldn't he radio or call? He wouldn't have to have gotten into the personnel basket if it was dangerous. You're right. He could have exercised stop-work authority.  Well, he's saying he's not going to do it. I mean, did the repair order have a time frame? Well, it was assigned that day. It was assigned to get done, but it didn't have to get done. There's nothing in the record that says it has to be done in the next 30 minutes. It has to be done in the next hour. But it was a crane that was down on a platform that they wanted repaired. But if the winds are that high, they're not going to use the crane anyway. Well, they were using cranes, and that's the point. The point is that DYNAMIC was authorizing use of cranes or repairs of cranes and whether that it should not be. And whether or not that was a reasonable decision for DYNAMIC to be authorizing work on the day in question goes to their duty to monitor whether or not authorized work in dangerous conditions and to be able to, you know, whether or not that's reasonable or not reasonable would be left to the determination of a jury. It's not a matter of law. Let me just ask you for my own information of what happened to this fellow. I know he dropped, but what injuries did he suffer? He dropped. He had a compression fracture in his vertebrae. He had a knee injury that required scoping I think a few times as well as a shoulder injury. Okay. All of which were complained of on the day of the incident. Yes, sure. And he's covered by the Longshore Act, I suppose. He was covered by the Longshore Act, and he was. Yes, Your Honor. But he affected settlements with several other potential defendants, correct? Months later after this determination was made, there was, and it's true, there was a, I guess, meeting of the minds between the parties prior to trial. We call it a settlement and payment of money. Right. Correct. There was a settlement and there was a payment of money. That happened much later after the, I think it was about eight months or so, after this summary judgment was granted. All right. But going back to, I guess, twofold, when you look at what the determinations the court made is the court, when it made this ruling, stood in the shoes of a jury. And the way the opinion is worded when it says Troy Rocket did not authorize the work, instead he simply requested it to be done, that is making a factual determination. So we feel that the court should be overturned on the fact that there is an authorization, an evidence of implicit or express authorization under the law, which is an exception to principles liability for an independent contractor, is our main point. The other point is regarding the ultra-hazardous condition. The best example I could come up with would be that when you are working with explosives, it doesn't matter how much care you have, things can still go wrong. And that's what the court has kind of used as a guideline for what is ultra-hazardous. In this situation, when you have a crane being operated with a basket transfer and winds that a helicopter won't even land in due to their hurricane-type nature, that itself can also be characterized as an ultra-hazardous condition. And the reason for that is no matter how much care you exercise when operating a crane in high winds, a danger still presents itself. And I appreciate your time, and I will talk to you in a few minutes. Thank you. Ms. Nicholson. May it please the Court. My name is Penny Nicholson, and I'm here today representing the Appellee Dynamic Offshore Resources. Now, both parties to this appeal agree on what the governing rule of law is, and both parties agree on what the exception to that rule is. And that is that provided the Court with some demonstrative aides, and they set forth the rule. And basically, it's that a principal is not liable for the activities of an independent contractor committed in the course of performing its duties under the contract. Is the information that you gave us this morning included in your brief? Yes. Yes. All of the cases were all cited in the brief, and all record references are from the record, and there's record cites for every factual statement. And was it provided to opposing counsel before this Court? Yes. Yes, it was, Your Honor. And so the general rule is that a principal is not liable for the activities of an independent contractor committed in the course of performing its contract. There are two exceptions to that rule, and one is that a principal cannot avoid liability if the activity is ultra-hazardous. The other exception has two components to it. The first one is that if the principal has exercised operational control, the principal cannot, you know, will be liable. Also, if the principal has authorized an unsafe work practice, the principal will be liable. And so that's the general rule that everybody agrees on here. From the district court, the issues have narrowed substantially from what was before the Court on summary judgment. Probably most significantly in the trial court, the plaintiff alleged, argued that there was not an independent contractor relationship between the plaintiff and Gulf Crane, who was the plaintiff's employer, the Wood Group that supplied the lead operator, and Shamrock that provided the crane operator. But now the plaintiff has abandoned that argument on appeal, and it's undisputed that there were independent contractor relationships. The other thing, the argument that the plaintiff has abandoned on appeal, is his argument about operational control. And the trial court level, operational control was hotly contested, but that's abandoned, too. So what that means is that there are only two overarching issues that this Court needs to address in this appeal. First, whether a basket transfer is an ultra-hazardous activity. And second, whether dynamic authorized and unsafe practice. And because we believe that the answer to both of those questions is no, the summary judgment should be affirmed. Now, first, I want to address the ultra-hazardous activity aspect of the appeal. And that's tabs 2 through 5 of the little booklet relate to that argument. And tab 2 sets out the definitions that this Court has given of an ultra-hazardous activity. In the O'Neill case, the Court defined it as an activity that presents a risk of harm that cannot be eliminated through the exercise of due care. The Court put it a little bit differently, same idea but a little bit differently, when it said in Hawkins that an activity that can be done safely with the exercise of due care is not ultra-hazardous as a matter of law. So that's what the law is. In his deposition, which is made part of the summary judgment evidence, the plaintiff made an admission that we believe negates his ability to contend successfully that a basket transfer is ultra-hazardous. And that's quoted at the tab 3. And the plaintiff admitted that the basket transfer, and these are his own words, could have been carried out safely if the crane operator had swung the basket with the wind instead of into the wind. So what we have here is law that says that if an activity can be done safely, it's not ultra-hazardous. And we have the plaintiff admitting that the basket transfer could have been done safely. And so we think as a matter of law, that means that the basket transfer was not ultra-hazardous. Sotomayor, I don't want you to lose the train of your thought, but technically speaking, aren't hurricane winds 65 miles an hour in Tropical Storm or 45? Or am I? Well, I'm not sure what the exact level is. I think there's no evidence. I mean, there's no question 35-mile wind is very brisk. But I just think technically it's not a hurricane. Well, no, I agree with that 100 percent. I think there's no evidence at all in the record of 75 or 65-mile-an-hour winds. There's no evidence, really, of hurricane-level winds. I think I agree that that is correct. But with respect to this idea that the plaintiff's admission precludes him from successful at succeeding on his ultra-hazardous activity argument, we think that the A also said, look, the plaintiff has admitted it could be done safely, so that means it's not an ultra-hazardous activity. And that is at page tab 4 of our booklet. In addition, as discussed, the case law holds that basket transfers are not ultra-hazardous as a matter of law. Those cases are set forth at tab 5 of the booklet. The most recent case is actually from the last month. It's the Menard case, again, recognizing that they're not ultra-hazardous. And Judge Elrod made a point that I think is an important one, and that is plaintiff's main contention seems to be not that basket transfers in general are ultra-hazardous, but because this particular, allegedly this particular transfer was conducted in windy conditions, it was ultra-hazardous. And I think the analysis does have to be done on a generic basis. The kinds of things that have been held to be ultra-hazardous are blasting with explosives, pile driving, crop dusting, that kind of thing. And when you look at the case law, when the Court analyzes activities, they don't like, say, the Ainsworth case as an example. That was a case where the plaintiff was injured during an offshore platform during drilling operations conducted at night without lights. The plaintiff contended that was an ultra-hazardous activity. This Court rejected that argument, but in doing so, it didn't analyze whether drilling at night without lights was ultra-hazardous. It looked at whether drilling operations in general, generically, were ultra-hazardous. So I think that the judge was correct, and they're not, with respect to the ultra-hazardous exception, and the plaintiff is not entitled to rely on that section as a matter of law. I now want to turn to the authorization of an unsafe practice portion of this appeal, which is covered in tab 6 and 7 of the booklet. And the first thing I want to say about that is the entire argument seems to be based on a false premise, and it seems to be contrary to the record. According to plaintiff, the basket transfer in which the accident happened was an unsafe practice authorized by Dynamic. But that's just not true. The plaintiff affirmatively requested that basket transfer, and it wouldn't have happened, and the accident wouldn't have happened if he hadn't affirmatively requested it. Ginsburg. Did Rocca even know he was trying to take the basket? No. I mean, I was not. I mean, he wouldn't have. I mean, most of the counsels refer to implicit direction or implicit authority. That's just not factually supported. I don't think that it is. It is true that he requested that the crane be repaired, and you can put, say, a request, an order, a specification of what's done, but that's what principals do. They tell independent contractors what work they want done. But what really happened here, and this is undisputed. I know it's summary judgment, so you have to take the most favorable version to the plaintiff. But even under the plaintiff's version, he was — he arrived at Platform 79C. He was taken by boat to Platform 86A. While he was still on the boat, the first thing that happened was that a wench was lowered from the platform in a basket. The next thing that happened was that Gary Dolme of the Wood Group was lowered from the platform in a personnel basket. I thought this was an unmanned platform. I don't believe that's correct, Your Honor. This was a — 86A was a manned platform. 86B was unmanned. So the — Oh, he was getting equipment to go to 86B. Right. That's exactly right. So 86B unmanned, 86A manned. Right. And so when Mr. Dolme got down to the boat, the plaintiff asked him, hey, what are we doing today? What are the plans today? And Mr. Dolme said, well, we're going to go over to Platform 86B, and we're going to fix the crane. We're going to replace the wench. And Mr. — the plaintiff said, no, we're not. The conditions are too windy. I'm not going to do that. He was going to exercise his stop-work authority, which he had every right to do. He testified that he had stop-work authority at all times, and he was an independent contractor, so he had the right to do that. When he told Mr. Dolme that he was not going to repair the wench until — or the crane until the winds had died down, Mr. Dolme handed him a handheld radio so he could call Mr. Rocca, the dynamic foreman, and tell him of his decision. But Mr. — but the plaintiff rejected the offer of the radio and said, you know what? That's not how I want to handle this situation. I think it would be more professional if I went up to the platform where there's a telephone and talked to Mr. Rocca privately. So the basket at this point was already on its way back to the platform, and to comply with Mr. — the plaintiff's request, Mr. Dolme called the basket back so that the plaintiff could get on the basket and go back up to call Mr. Rocca on the phone, which was there — there was no reason why he needed to do that, to exercise his stop-work authority. Why did he want to have a private conversation? Well, the only thing in the record about that is he thought that it would be more professional, and I think not everybody would hear it, and he just felt like it was a more professional way to handle it. But he'd already decided to exercise his stop-work authority, and he certainly could have done it from the boat, and if he hadn't made the affirmative request for a basket transfer, the accident would never have happened. And in looking at his request, I think it's important to bear in mind that he himself was a crane operator. He had, by his own testimony, participated in hundreds of basket transfers, so he knew a lot about basket transfers. He believed that the basket transfer would be safe. Even after the accident happened, he thought it would have been safe if the crane operator had swung the basket with the wind instead of into the wind. So the argument that this was — the basket transfer was an unsafe practice authorized by dynamic, we believe, is just incorrect. I'd also like to now look at page 24 of his brief. The appellant lists 12 reasons why he thinks that this was an unsafe practice that the dynamic authorized. The first five points all really boil down to that dynamic specified the work to be done. Whether you call it a request or an order or whatever you call it, they specified the work to be done. And it just can't be that specification of work can be — that authorization of work can be the same thing as authorization of an unsafe practice, because otherwise the principal could never tell the independent contractor what work he wanted done. And so those first five bullet points don't really advance the argument. There is another aspect to the first point, which is it says that Mr. Rocca had control over the whole field. And even if in some sense, because there's the owner, I mean, that seems to be what they're really saying, but there's cases that have held that, look, just because you have a company man present, that's not authorization of an unsafe practice, and it's not operational control. And in this case, Mr. Rocca wasn't even present at Platform 86A. He was off at another platform, 79A. The sixth bullet point, I think, is a particularly interesting one. That one says Rocca's because that is simply wrong. Not only could the plaintiff disregard what he calls the order, he did disregard it. He decided that he was not going to repair the — the crane until the winds had died down. Now, he had every right to do that. He was an independent contractor, and he had stop-work authority, and he decided to do it. He also could have done the same thing with the basket transfer. He himself, there's testimony in the record, summary judgment evidence, that he admits he could have issued stop-work authority and not done the basket transfer. Of course, he wanted to do the basket transfer, so he wouldn't have done that, but he could have. He didn't have to take the basket transfer. The last points — the last six points on page 24 all basically relate to weather conditions, wind conditions, things like that. And those don't change the analysis, either, because the whole point of the principal-independent-contractor relationship is the principal assigns work by agreement to an independent contractor who takes responsibility for that work. And once the work has gone from the principal's plate to the independent contractor's involvement anymore and doesn't have responsibility anymore. So all these things about the weather conditions, that really fell into the plaintiff's plate. It was for the plaintiff, the independent contractor, to decide whether the weather conditions were too bad to go forward with the repair of the crane or not. And if he thought they were — the conditions were too dangerous, it was up to him not to do it, to issue stop-work authority. And, in fact, that's exactly what he did in terms of the repair of the crane. He said not doing it. And he could have done the same thing with the basket transfer. And, in fact, he wouldn't have needed to do it with the basket transfer, because that only happened because he requested it. Another point I'd like to make is that if anybody else was responsible for the accident or the situation, besides the plaintiff and besides the crane operator, it would have been the wood group, which provided the lead operator. And that's kind of — it's undisputed that the foreman was not at the platform, Troy Rocca. And the sign-in sheet also reflects that no other dynamic personnel were present at the platform. And the plaintiff said that he was not aware of any other dynamic personnel being present at the platform, then the lead operator is the one in charge. He's in charge of safety. He's in charge of operations. So the fact that if, in fact, this was an unsafe practice, it would have been up to the wood group to stop the basket transfer if it was, in fact, unsafe. And so we believe that summary judgment should be affirmed. And that concludes my argument, unless you have some questions. I don't think so. You're very thorough. Thank you. Okay. Mr. Findley, rebuttal. Yes, Your Honor. First, I wanted to address your point earlier. If I misspoke earlier talking about hurricane-type winds, I don't believe that 35 miles or 30-mile-an-hour winds are hurricanes. What we do believe is that they are excessive winds. And if you look at the record as a whole, even the crane operator in this case testified when he was deposed that you should not be doing personnel baskets in 30-mile-an-hour winds. And it's page 17 of our summary judgment response that was filed with the district court. And he says yes. And the reason is, is because it's dangerous. Isn't it? Yes. 30-mile-an-hour winds that you, as an operator, would not want to be doing personnel transfers in, correct? If you have 30-mile-an-hour winds, no, you wouldn't want to do it. And it's Exhibit H to that, which is his deposition. And I think that's important here, because at the time, when we talk about implicit authorization, at the time that Mr. Davis is on the boat, he does not know the wind speed. What he knows is there is wind. And when the implicit order comes from the fact that the boat was sent specifically to this platform for the purposes of using the basket. The basket was being used at the time of this incident, meaning they were transferring personnel already, they were transferring equipment already, and they were doing all of this at the order of dynamic. Troy Rocket. Now, a plaintiff did get in the personnel basket and travel back up to the platform for the purposes of making the call. And the reason for that was the fact that the radio goes all over to every single rig. And he testified in his deposition that he didn't want to alert everyone all over the whole different, all over everywhere. He wanted to have a one-on-one conversation with Troy Rocket about the conditions that he was seeing. There was no wind gauge at this platform. There was a wind sock only. And so those are the things that he was going to talk about. But it's important, if you look. Well, how did they know it was 30 to 35 miles an hour? Because the wind sock, if it's straight out, it's a 30 mile an hour wind sock. And it was straight out. Testimony says it was straight out on the day of the incident. But not only that, the weather buoy was a short distance away. And it was in the root cause analysis that had a knot speed on it that translated to 30 miles an hour. And there was testimony that because the rig is 100 feet higher in the air, that it was even faster than 30 miles an hour. Did your client see the wind sock? He saw it as he was going in, while he was in the basket going to the top. He said he saw it at that point. And is it correct that he was a crane operator before? It was correct. He has a crane operation license. I think his duty was an actual repairman. That's why he was being sent out there. Well, you can see the white caps. I mean, there will be white caps and 10-foot swells. Correct. And so I think that goes to the Boonton case versus Newfield. And when we talk about implicit order, the court has ruled in the past that when someone tells someone they need additional workers, and in this case it was about repairing a foghorn. He tells the principal, I need additional workers. The principal leaves. He doesn't give them to him. The gentleman, Mr. Boonton, goes and does the work anyway himself, and he's injured at that point. And the court ruled that that is an implicit authorization. When you heat, there's no other way to do the work. You requested more people. The person leaves, and you decide to do, even if you decide to do it anyway, you're doing it under the implicit authorization. And so I think that's an important distinction that needs to be made, is implicit authorization or express authorization are both standards that have been met in this case that we feel, and whether or not what he did was reasonable, should be determined by a jury. The other case I wanted to point out is a case, Judge Jones, you were on, the Callahan case. And what that case, I think what's important about that case when dealing with him and golf logistics is he was asked the question, did you think that you could safely perform the personnel basket transfer in the conditions? Yes, sir, I felt I was obligated to do it, so yes, I felt it was safe enough to do it. Now, you eventually made the personnel basket transfer safely, correct? Correct. And the court correctly pointed out that his subjective belief concerning the safety of a personal basket transfer may be probative, but it's not dispositive of whether or not golf logistics breached their duty of care by setting up the transfer. Well, in this case, I mean, those statements on his part would go to comparative liability and they would go to ultra-hazardous activity, right? Correct. At best. But they don't go to whether the company authorized it, right? Yes, and I completely agree with that, Your Honor. The statements of whether or not he thought it was appropriate, I think, implicitly or expressly authorizes work and whether or not it was proper to do so. Okay, we have your order. Thank you. Have a good afternoon.